# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 8, 2008

## STATE OF TENNESSEE v. CHRISTOPHER STEPHEN HAYES

### Direct Appeal from the Circuit Court for Gibson County
### No. 17636   Clayburn Peeples, Judge

---

### No. W2007-01894-CCA-R3-CD  - Filed October 7, 2008

---

A Gibson County Circuit Court jury convicted the appellant, Christopher Stephen Hayes, of attempted second degree murder, two counts of reckless endangerment, and one count of possession of a deadly weapon with intent to use it in the commission of an offense, and he received an effective ten-year sentence to be served in confinement.  On appeal, he contends that (1) the evidence is insufficient to support the attempted murder conviction, (2) his sentences are excessive and the trial court erred by granting his request for alternative sentencing, and (3) the trial court made a clerical mistake on the judgment form for the attempted murder conviction.  Based upon the record and the parties' briefs, we affirm the appellant's convictions but modify the appellant's attempted murder conviction from ten to eight years.  We also remand the case to the trial court in order for the court to sentence the appellant for the possession of a deadly weapon conviction, to address alternative sentencing, and to correct clerical mistakes on several judgment of conviction forms.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Modified in Part, Reversed in Part, and the Case is Remanded.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Christopher Stephen Hayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William Paul Phillips, District Attorney General; and Larry Hardister and Hal Dorsey, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

Debra Seward testified at trial that she was Mary Copley's first cousin. About 4:30 or 5:00 p.m. on January 2, 2005, Seward arrived at Mary and Terry Copley's mobile home in Milan, Tennessee to babysit the Copleys' three youngest children while the Copleys traveled to Nashville. As the Copleys were pulling out of the driveway, the telephone rang and Mary's[1] daughter, Kelly Smith, answered it. Kelly said into the phone, "Leave my mama alone. She don't want nothing to do with you. Stop calling." Seward took the phone from Kelly, and the male caller thought Seward was Mary Copley. Seward told the caller that "I'm not who you think this is." The caller asked, "Well, who are you?" Seward told him that she was "Sissy" and that Mary and Terry Copley were not there. The caller did not believe her, and Seward hung up the phone.

Seward testified that at some point, Kelly answered the phone again and told the caller, "Leave my mama alone. She don't want nothing to do with you." Seward took the phone from Kelly and asked the male caller, "Is this Little Hayes[?]" The man said yes, and a second man got on the telephone and identified himself as "Smokehouse." Seward heard a third male's voice in the background, but Seward did not ask his name. The three men continued to make calls to the mobile home that night, and Little Hayes still believed Seward was Mary Copley. Seward said that during one conversation with him, he asked Seward to meet him at Cades Store and told her that he had two friends and they could "hold me down and I'd enjoy it." Little Hayes also told Seward, "I'm gonna come kill you, bitch" and "If [Mary's] not there, you'll do." Seward stated that she recognized Little Hayes' voice as that of the appellant. She said that she did not know the appellant personally but that she had heard his voice previously.

Seward testified that after receiving that last threatening telephone call, the three men came by the trailer and shot into the air. A few minutes later, they telephoned and asked Seward, "Are you scared?" Seward told them no. However, she telephoned the police, and an officer came to the home. Officer Chris Jonhston told Seward that he would ride around and look for the men and that she should call the police if the men returned. The appellant telephoned Seward again and said, "I'm gonna kill you, bitch, and how do you know I'm not standing outside the window looking at you right now[?]" Seward stated that "the bullets started coming through the wall and the window." Seward told the Copleys' two sons, who were in the living room, to get down onto the floor. Seward also got onto the floor and felt a hot, stabbing pain on her right side. She stated that she had been wearing a chain on her hip and that one of the bullets hit the chain and ricocheted off. The wound was painful, but Seward was not seriously injured. She acknowledged that six or seven shots were fired into the trailer.

On cross-examination, Seward stated that Mary Copley had an affair with the appellant in

---

[1]Because some of the witnesses in this case share a surname, we have chosen to utilize their first names for clarity. We mean no disrespect to these individuals.

the summer of 2004 while Mary and Terry Copley were separated. She acknowledged that the Copleys' trailer was on a hill and sat several hundred yards from Idlewild-Holly Leaf Road. A ditch, some "little trees," and some weeds were between the road and the trailer. She stated that the first shooting occurred about 8:30 p.m. and that she heard a loud vehicle outside the trailer. After the first shooting, Seward called her brother and Johnny Clifton, whom she was dating at the time. They came to the trailer, stayed for a little while, and left. Seward did not see the appellant during the first shooting, but he had telephoned just before the shots were fired. She stated that the second shooting occurred about 11:00 p.m., that she did not hear the loud vehicle, and that she did not see who fired the second shots. She said that she received about twelve telephone calls that night, and she acknowledged that some of the appellant's phone calls were recorded by the Copleys' answering machine. However, the messages on the machine could not be saved. The answering machine also had caller ID, and Seward reported the number on the caller ID to the police. She said that she could not remember the telephone number on the caller ID but that the number was for a cellular telephone.

      Mary Copley testified that she and the appellant dated from April to August 2004 and that their relationship ended when she and her husband, Terry, reconciled. However, the appellant tried to contact her and telephoned her home every weekend, asking when they were going to get back together. When he called, he sounded like he had been drinking. Mary refused to talk to the appellant and hung up on him. The appellant also left threatening messages on the Copleys' answering machine for Mary's husband. She stated that in the messages, the appellant said he was "gonna pop a cap" in Terry and "kick his ass." On January 2, 2005, Mary and Terry arrived home from Nashville between 11:00 and 11:30 p.m. Police cars were present, and an officer told Mary "the house had been shot up." Mary's children told her the appellant had called the home and had "shot up" the residence. Mary checked the caller ID and saw the appellant's telephone number on it about twenty times. She stated that before she and her husband left for Nashville earlier that day, the appellant left a message on the answering machine, and she could hear John Clark's and Ronnie Green's voices in the background.

On cross-examination, Mary testified that Terry had argued over the telephone with the appellant previously but that she had never heard Terry threaten the appellant. She acknowledged that Terry had shoved the appellant previously at a friend's house. On the night of January 2, the Copleys' answering machine recorded four or five messages left by the appellant. However, the machine was digital, and a lightening strike caused the machine to lose the messages about one year later. The police knew about the messages. Mary stated that she was "pretty sure" the appellant's telephone number was a "415 number." She said that some of the calls on the caller ID were from John Clark's telephone. She stated that she could tell from the messages on her answering machine that the men had been drinking, and she acknowledged that in one of the messages, Ronnie Green referred to Terry Copley as "Krispy Kreme."

Deputy Sean Shepard with the Gibson County Sheriff's Department testified that on January 2, 2005, he talked with Debra Seward about some harassing telephone calls and about some shots being fired into the Copleys' trailer. Seward believed the appellant and "Smokehouse" had made the calls. "Smokehouse" turned out to be Ronnie Green. About 11:30 p.m., Deputy Shepard found

the appellant at home and took possession of two long .22 caliber rifles that were laying on a bed. The appellant told Deputy Shepard that he had used one of the guns in the shooting. That gun was a bolt-action, which required a person to pull a lever and slide the lever back in order for the gun to fire. The appellant gave a written statement in which he said the following: That night, the appellant and Christie Clark, John Clark's wife, returned to the appellant's home from Three-Way, Tennessee. The appellant, John Clark, and Ronnie Green drove to the Copleys' home, intending to scare Terry Copley. The appellant leaned out the window of Clark's truck and shot the .22 rifle about ten times. In the statement, the appellant claimed that "I was attempting to fire over the trailer, but was so drunk that evidently I didn't shoot high enough. Nobody in the truck had the intent of doing bodily harm." The appellant also claimed in the statement that the shooting was a "drunken mistake" and that he did not remember all of the events because he was very intoxicated. Deputy Shepard said that the Copleys' trailer was on top of a slight hill and that it was about two hundred feet off the road. Deputy Shepard saw bullet holes in the trailer and counted six on the outside and at least four inside. He also found two .22 caliber shells on Idlewild-Holly Leaf Road.

On cross-examination, Deputy Shepard testified that according to the police report, the first shooting occurred about 9:00 p.m., and the second shooting occurred about 10:51 p.m. Deputy Shepard used gun residue kits on the three men, but he did not have analysis performed on the kits. He also did not test the guns for fingerprints and did not send the bullets to the laboratory for testing because the appellant had confessed to the shooting. He acknowledged that the appellant smelled of alcohol and appeared to have been drinking. However, on redirect examination, he acknowledged that the appellant was walking around, recognized the deputy as a police officer, and responded to the deputy's questions. He also acknowledged that he did not see any bullet holes in the trailer's ceiling.

Michael Smith, Mary Copley's thirteen-year-old son and Terry Copley's stepson, testified that on January 2, 2005, he was eleven years old and answered some of the appellant's telephone calls to the family's home. He stated that he recognized the appellant's voice over the telephone and on the answering machine. The appellant told Michael that he was going to kill Michael's mother and that if she was not home, Seward would "do." During the first shooting, Michael heard two to four gunshots. Two or three of those shots hit the trailer's underpinning but none entered the home. After the first shooting, Michael spoke with the appellant over the telephone, and the appellant said he was "gonna do it again and that he would kill her and he would kill her if she wasn't there." The second shooting occurred one or two hours later. Michael said that just before the second shooting, he was sitting on the floor beside a window and was watching television. He covered his head and heard Seward say, "He hit me." Michael stated that he heard eight or nine gunshots during the second shooting, and he acknowledged that he was scared.

On cross-examination, Michael stated that he had seen the appellant drive by the trailer earlier that day in the appellant's white truck. He said he recognized the appellant's voice because the appellant had left messages on the Copley answering machine previously. He said he was not injured in the shootings. On redirect examination, Michael testified that a telephone number came up on the caller ID ten to fifteen times. Mary Copley had told Michael previously that the number

was the appellant's telephone number.

Steven Ray Copley, Terry Copley's fourteen-year-old son and Mary Copley's stepson, testified that on January 2, 2005, he answered the telephone and recognized the appellant's voice. The appellant was saying "bad stuff" and that he was going to rape and "do all this other stuff" to Mary Copley. Later, the appellant stopped in front of the Copleys' trailer, shot into the air, and "took off real fast." After the first shooting, Steven spoke with the appellant over the telephone, and the appellant said he was "gonna rape my babysitter in front of her boyfriend and then carry her and throw her in a [gully]." About fifteen minutes later, Steven heard the second set of gunshots. He stated that he was sitting in a chair about one foot away from a window and that about nine shots were fired. After the shooting stopped, he got onto the floor and crawled to "Sissy." Seward was crying and was holding her hip. She pulled up her shirt, and her hip was bruised.

Janet Hayes testified for the appellant that she was married to the appellant's uncle. To her knowledge, the appellant's phone number never began with "415."

Roger Hayes, the appellant's uncle and Janet Hayes' husband, testified that on the night of January 2, 2005, he and his wife went out to dinner. When they returned home about 10:00 or 10:30 p.m., Janet saw the appellant and Christie Clark leaving in the appellant's truck. About 1:00 or 1:30 a.m., Roger was awakened by John Clark "beating" on Roger's door. John told Roger the appellant had been arrested. Roger went to the appellant's house and saw John Clark throwing .22 caliber spent shell casings from John's truck into the appellant's truck. On cross-examination, Roger acknowledged that in the appellant's statement to police, the appellant said he fired the gun about ten times from John Clark's truck.

Christie Hayes, the appellant's wife, testified that she was married to John Clark at the time of the alleged crimes. On the night of January 2, 2005, Christie and the appellant drove to a store in Three Way, Tennessee. Before the appellant and Christie left the appellant's house for the store, Ronnie Green and John Clark came into the home and got guns. Christie said she thought the guns were a .22 caliber gun and a shotgun. She said John and Ronnie were "ranting and raving that they had been shot at" and left the house in John's blue truck. When Christie and the appellant returned to the appellant's house about one hour later, John and Ronnie were there. John and Ronnie wanted to leave, and the appellant left with them in John's truck. Christie said the men did not take the guns with them.

On cross-examination, Christie acknowledged giving a statement to Deputy Shepard. In the statement, she told the police that she heard John and Ronnie say, "[B]ang, bang." She said that although she did not know anything about the shootings, the police "were threatening me with DHS . . . so I told them basically what they wanted to hear." She said that on the night of January 2, "all John wanted to do [was] go fight Krispy Kreme." On redirect examination, Christie testified that she did not see any of the men make any telephone calls.

The appellant testified that he was a truck driver; had never been convicted of a felony; and

had two children, ages six and ten years old. In April or May 2004, the appellant began having an affair with Mary Copley. Mary was still living with her husband, but she came to the appellant's house on weekends. The arrangement continued for four months until the appellant broke up with Mary because he got tired of Terry Copley following and telephoning him. Although the appellant's relationship with Mary ended in August 2004, Terry continued to telephone the appellant "on occasion and ask if I'd seen her or if she was with me." The appellant did not telephone Mary, but Mary called him. He said his phone number never began with "415."

The appellant testified that on January 2, 2005, John Clark and Ronnie Green telephoned the Copleys' home and that at least four of the calls were made from John's telephone. Ronnie also called the Copleys' trailer using the appellant's telephone. Ronnie told the appellant, "Here, it's Mary" and handed the telephone to the appellant. The appellant said, "Hello." A woman on the phone stated that she was not Mary Copley, so the appellant handed the phone back to Ronnie. The appellant said he never talked to the Copleys' sons and never threatened Seward. The appellant stated that he, Ronnie, and John went to a bar and that they had been drinking "[a] whole lot." About 9:00 p.m., they left the bar and stopped by the Copleys' house. John and Ronnie started screaming and yelling with someone who came out of the trailer. The person started shooting at them, so they got back into John's truck and drove away. The person fired seven shots, and the gunshots sounded like they came from a .22 or .25 caliber gun.

The appellant testified that the three men returned to the appellant's house and that he and Christie Clark drove to Three Way about 9:45 p.m. John and Ronnie said they were going back to the Copley trailer and left the appellant's house. The appellant and Christie returned from Three Way between 10:30 and 11:00 p.m. When they pulled up, Ronnie and John came out of the appellant's house and were "all jumping around and excited." Ronnie told the appellant that "they come out with something bigger this time . . . [but] . . . I got them." He showed the appellant an empty shotgun shell. Ronnie and John kept telephoning the Copley home, and the appellant left with them. While Clark drove by the Copleys' trailer, the appellant "pumped maybe five or six rounds off in the air." He said he was not aiming at the trailer or in its direction but was aiming the .22 caliber gun "[a]s straight up as I could get." He stated that he was only trying to scare someone. He acknowledged that he gave two statements to police and said that he did not tell the police the truth in the first statement because Deputy Shepard "was standing over me just screaming and hollering in my face."

On cross-examination, the appellant acknowledged that in his first statement to police, he said he fired the shotgun into the air and that one of the other men fired the .22 caliber gun. He said he lied because "[t]hat's what Sean Shepard wanted to hear." He denied knowing anyone was in the trailer during the shooting and said he did not remember if any lights were on in the home. He said he was not thinking that night because "I was so drunk I didn't know what I was thinking about or who I was."

On redirect examination, the appellant testified that he never threatened Terry Copley but that Copley had hit him one time previously. He said that he was sorry for the shooting and the torment

it had caused his family and that he was not aiming the gun at the trailer. On recross-examination, he stated that during the first shooting, two people were on the Copleys' porch and someone shot at the appellant, Ronnie, and John. He acknowledged that he did not tell the police someone shot at them.

The parties stipulated that John Clark and Ronnie Green were allowed to plead guilty to unlawful possession of a deadly weapon. Although the appellant had been charged with attempted first degree premeditated murder of Debra Seward, the jury convicted him of the lesser included offense of attempted second degree murder. The appellant also had been charged with two counts of aggravated assault of Seward, reckless endangerment of Seward, reckless endangerment of Michael Smith, reckless endangerment of Steven Ray Copley, and possession of a deadly weapon with intent to use it in the commission of an offense. The jury convicted him of reckless endangerment of Smith and Copley and unlawful possession of a weapon.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his conviction for attempted second degree murder because the evidence shows he was extremely intoxicated at the time of the offense and because "other factors . . . point to the conclusion that his actions constituted reckless conduct." The appellant notes that the State presented little forensic evidence in this case and that law enforcement failed to maintain the appellant's messages on the answering machine. The State contends that the evidence is sufficient to support the conviction. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. §

39-11-106(a)(20). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

The evidence at trial established that the appellant had been telephoning the Copleys' trailer all evening and repeatedly threatened to harm Mary Copley and Debra Seward. The appellant, Ronnie Green, and John Clark went to the trailer, and the appellant fired into the air. No one was injured during the first shooting. The appellant then telephoned the trailer again and threatened to kill Debra Seward. He admitted that he returned to the trailer with Clark and Green and that he fired about ten shots. Several of the gunshots penetrated the trailer's walls, and one struck Seward's thigh. The appellant obviously knew people were in the trailer. That the jury determined the appellant was guilty of the lesser included offense of attempted second degree murder rather than the charged offense of attempted first degree murder suggests that it carefully considered the evidence. Although the appellant contends that he pointed the gun into the air and did not intend to hit the trailer, we conclude that the State presented ample evidence from which a rational jury could have concluded that the appellant knowingly attempted to kill Debra Seward.

Regarding the appellant's claim that he was too intoxicated to have acted knowingly, evidence of voluntary intoxication, while not a defense, may be admitted to negate a culpable mental state. See Tenn. Code Ann. § 39-11-503(a). The evidence established that the appellant had been drinking alcohol on the night of the crimes. However, Deputy Shepard testified that while the appellant smelled of alcohol, the appellant was walking around, knew Deputy Shepard was a police officer, and answered the deputy's questions. We note that despite the appellant's claim that he was too intoxicated to know what he was doing on January 2, 2005, the appellant testified clearly about the night's events. The trial court instructed the jury on voluntary intoxication, and the jury obviously concluded that the appellant was not so intoxicated that he could not form the "knowing" mental state. Taken in the light most favorable to the State, the jury's conclusion was reasonable. The appellant is not entitled to relief.

## B. Sentencing

The appellant contends that his ten-year sentence for attempted second degree murder is excessive because the trial court misapplied enhancement factors and that the trial court erred by denying his request for alternative sentencing. The State argues that the appellant's ten-year sentence is appropriate. We conclude that the trial court erred by applying enhancement factors to the appellant's sentence for attempted murder and, therefore, modify the sentence from ten to eight years. We also remand the case in order for the trial court to sentence the appellant for the possession of a deadly weapon conviction and for the trial court to address the appellant's request for alternative sentencing.

At the appellant's sentencing hearing, the parties "agreed to stipulate" to the appellant's presentence report. Although the appellant has not included the report in the appellate record, the

defense questioned the appellant about facts contained in the report, including that the then thirty-four-year-old appellant was married with two biological children and two step-children. The appellant testified that he was working for Taylor Trucking at the time of the crimes and had never been convicted of a criminal offense. He stated that he regretted committing the offenses because it had hurt him and his family. However, he maintained that he did not make any telephone calls to the Copley trailer on January 2, 2005, and that he did not intend to shoot into the trailer. He asked that the trial court take into consideration that he needed to support his family and that his wife depended on his income and insurance to support her son, who suffered from cerebral palsy. He stated that he had had no further contact with the Copleys. On cross-examination, the appellant stated that "[t]his is some my fault" and that he had no explanation for how he shot into the trailer.

The trial court applied enhancement factor (3), that the appellant "was a leader in the commission of an offense involving two (2) or more criminal actors"; (4), that the offense involved more than one victim; and (5), that some of the victims were particularly vulnerable because of age, to the appellant's sentences. See Tenn. Code Ann. § 40-35-114(3), (4), (5) (2003). The trial court also noted that it was "greatly troubled" by the appellant's failure to take responsibility for his actions. In mitigation, the trial court applied factor (11), that the appellant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Tenn. Code Ann. § 40-35-113(11). The court also noted that the appellant had no prior criminal convictions and that he was supporting his family. See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the appellant to ten years for the attempted murder conviction, a Class B felony, and to two years for each reckless endangerment conviction, a Class E felony. It ordered that the appellant serve all of the sentences concurrently, for an effective sentence of ten years in confinement. The court did not pronounce a sentence for the possession of a deadly weapon conviction, a Class E felony, and did not address alternative sentencing.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Initially, we note that although the parties agreed to stipulate to the presentence report, the report is not listed as a sentencing hearing exhibit and apparently was not formally introduced into evidence at the hearing. Moreover, the appellant has failed to include the presentence report in the

appellate record. It is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(a). Ordinarily, the presentence report is a necessary part of this court's review, and without it, we must presume that the sentences imposed are correct. See State v. Beech, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987). Nevertheless, we will address the appellant's claim that the trial court misapplied enhancement factors.

According to the State's brief, "it is unclear whether the defendant [was] to be sentenced under the pre-2005 sentencing statute or its post-2005 amendments." For offenses committed prior to June 7, 2005, sentencing was governed by prior law, which provided for "presumptive" sentences. The presumptive sentence was the midpoint in the range for Class A felonies and the minimum in the range for all remaining felonies. See Tenn. Code Ann. § 40-35-210(c), (d) (2003). Trial courts then were to enhance and/or mitigate a defendant's sentence based upon the application of enhancement and mitigating factors. See Tenn. Code Ann. § 40-35-210(d), (e) (2003). In Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004), the United States Supreme Court concluded that the "'statutory maximum' for Apprendi [v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." See also Gomez v. Tennessee, ___ U.S. ___, 127 S. Ct. 1209 (2007). In response to Blakely, our legislature amended Tennessee's sentencing scheme and eliminated presumptive sentences. The Compiler's Notes to Tennessee Code Annotated section 40-35-210 (2006) provide that

> for defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, the defendant may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections. Upon executing such a waiver, all provisions of the act shall apply to the defendant.

In the present case, the appellant committed the offenses in January 2005 and was sentenced on June 22, 2007. The trial court did not state whether it was sentencing the appellant pursuant to the prior sentencing statute or the new sentencing provisions. However, because the appellant did not execute a written waiver of his ex post facto protections, the trial court was required to sentence the appellant under the prior sentencing law. See State v. Jarvis Harris, No. W2006-02234-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 678, at *30 (Jackson, Aug. 24, 2007); State v. Marco M. Northern, No. M2005-02336-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 459, at **52-53 (Nashville, June 11, 2007). The trial court sentenced the appellant to the minimum in the range for the reckless endangerment convictions. However, given that the appellant had no prior convictions, the trial court erroneously enhanced his sentence to ten years for the attempted second degree murder conviction.[2] Therefore, the appellant's sentence for the attempted murder conviction is modified from ten to eight years, the minimum punishment in the range.

---

[2]Irrespective of the trial court's erroneous application of enhancement factors pursuant to Blakely, the State concedes that the trial court misapplied enhancement factors (4) and (5).

Regarding the appellant's request for alternative sentencing, pursuant to the prior sentencing statute, an appellant was eligible for alternative sentencing if the sentence actually imposed was eight years or less. See Tenn. Code Ann. § 40-35-303(a) (2003). An appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6). In the present appeal, the appellant is a Range I, standard offender convicted of Class B and E felonies. Therefore, he is not presumed to be a favorable candidate for alternative sentencing for the attempted murder conviction. Nevertheless, because the appellant's sentence has been modified to eight years, he may still be considered for alternative sentencing. We elect to remand this case to the trial court for a new sentencing hearing to address the applicability of alternative sentencing for the appellant's Class E felony convictions. Upon remand, the trial court also is to sentence the appellant for his possession of a deadly weapon conviction.

### C. Mistakes on Judgment of Conviction Forms

The appellant contends, and the State concedes, that the judgment of conviction form for count one, attempted second degree murder, references the incorrect statute for the offense in our criminal code. On remand, the trial court is to correct that mistake. We also note that the trial transcript shows the jury did not convict the appellant of count four, reckless endangerment of Debra Seward. Nevertheless, the judgment of conviction form for the offense reflects that the appellant was found guilty and that the trial court sentenced him to two years. Therefore, upon remand, the trial court also is to correct the judgment for that offense.

Finally, the trial transcript clearly shows that the jury convicted the appellant of count seven, possession of a deadly weapon. However, the judgment of conviction form reflects that the "not guilty" box was check, and the sentencing hearing transcript confirms that the trial court did not sentence the appellant for the conviction. Therefore, the trial court is to correct the judgment of conviction form to reflect that the jury found the appellant guilty and, as stated above, sentence the appellant for the offense.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellant's convictions for attempted second degree murder of Debra Seward, reckless endangerment of Michael Smith, reckless endangerment of Steven Ray Copley, and possession of a deadly weapon with intent to use it in the commission of an offense. The appellant's sentence for attempted second degree murder is modified to eight years, and we remand the case to the trial court in order for the court to sentence the appellant for his possession of a deadly weapon conviction, to address the appellant's request for alternative sentencing, and to correct the judgment of convictions forms for counts one, four, and seven.

_____
NORMA McGEE OGLE, JUDGE